IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Kristy M. Wolff,<br>FNP-C, MSN,<br><br>                              Plaintiff,<br><br>          vs.<br><br>CapeSide Psychiatry, PLLC and CapeSide<br>Addiction Care, PLLC,<br>                              Defendants. | Civil Action No. 3:19-cv-1830-CMC-SVH<br><br>**ORDER** |

This matter is before the court on Plaintiff Kristy Wolff's ("Plaintiff") *pro se* Complaint alleging breach of contract by Defendants.  ECF No. 1.  Defendants, CapeSide Psychiatry, PLLC ("CapeSide Psychiatry") and CapeSide Addiction, PLLC ("CapeSide Addiction") (collectively, "Defendants"), have moved for summary judgment.  ECF Nos. 82, 83.  A *Roseboro* Order was mailed to Plaintiff, advising her of the importance of a dispositive motion and the need to file an adequate response.  ECF No. 84. Plaintiff filed a response in opposition to summary judgment. ECF No. 87.[1]

In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 (B)(2)(e), DSC, this matter was referred to United States Magistrate Judge Shiva V. Hodges for pre-trial proceedings and a Report and Recommendation ("Report").  On June 11, 2021, the Magistrate Judge issued a Report recommending Defendants' motion for summary judgment be granted.  ECF No. 92.  The Magistrate Judge advised the parties of the procedures and requirements for filing objections to

---

[1] Plaintiff also filed a motion for mediation before a Magistrate Judge at no cost because she is a *pro se* litigant.  ECF No. 86.

the Report and Recommendation and the serious consequences if they failed to do so.  Plaintiff

filed objections (ECF No. 95) and Defendants replied (ECF No. 96).

## STANDARD

The Magistrate Judge makes only a recommendation to this court.  The recommendation

has no presumptive weight, and the responsibility to make a final determination remains with the

court.  *See Mathews v. Weber*, 423 U.S. 261 (1976).  The court is charged with making a *de novo*

determination of any portion of the Report and Recommendation of the Magistrate Judge to which

a specific objection is made.  The court may accept, reject, or modify, in whole or in part, the

recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge

with instructions.  *See* 28 U.S.C. § 636(b).  The court reviews the Report only for clear error in the

absence of an objection.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315

(4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not

conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face

of the record in order to accept the recommendation.") (citation omitted).

2

## BACKGROUND

Plaintiff signed and returned an agreement provided by CapeSide Addiction under which Plaintiff was to provide tele-psychiatry services for patients referred to her by CapeSide Addiction. The agreement, entitled "Independent Contractor Agreement" ("ICA"), provided in relevant part as follows:

> THIS AGREEMENT is made and entered as of the 30th day of April 2018 by and between CAPESIDE ADDICTION CARE, PLLC ("Contractee"), and Kristy Wolff, NP an individual Nurse Practitioner ("Nurse Practitioner)" (hereinafter referred to collectively as the "Parties").

> WHEREAS, Contractee is a Professional Limited Liability Company in the State of North Carolina and engaged in the practice of mental/behavioral health medicine;

> WHEREAS, Nurse Practitioner is licensed to practice in North Carolina as a nurse practitioner, and is otherwise qualified to perform the services required hereunder;

> WHEREAS, Contractee desires to utilize Nurse Practitioner's services upon the terms and conditions hereinafter set forth, and the Nurse Practitioner desires to accept such work.

> NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

> 1. TERM AND TERMINATION. Initiation of agreement is contingent upon completion of all licensing and agency credentialing requirements. Thereafter, the initial term of this Agreement shall be for twelve (12) months commencing on April 30, 2018 if not sooner terminated as provided below, ending May 1, 2019. Thereafter, this Agreement shall automatically renew for additional one (1) year terms. Either party may terminate this agreement without cause at any time upon ninety (90) days advance written notice to the other party . . . .

> 2. NURSE PRACTITIONER'S DUTIES.

> 2.1 Nurse Practitioner shall perform all reasonable duties within the "Scope of Practice" as determined by the Nurse Practitioner's educational preparation and

3

national certification of a Nurse Practitioner licensed in the state of North Carolina.

2.2 Nurse Practitioner agrees to devote her full time and best efforts to the performance of these duties.

2.3 Nurse Practitioner shall abide by 21 NCAC 36.0810 & 21 NCAC 32M.0110 "Quality Assurance Standards for the Collaborative Practice Agreement."

2.4 Nurse Practitioner shall abide by 21 NCAC 36.0809 & 21 NCAC 32M.0109 "Prescribing Authority."

2.5 The Nurse Practitioner shall exercise independent professional judgment with respect to the care and treatment of all patients. The Nurse Practitioner agrees that the patient care services will be provided promptly, efficiently, and in a strict accordance with the ethical and professional standards for the provision of healthcare services adopted by the Contractee.

2.6 The Nurse Practitioner shall be responsible for the quality of medical care rendered by the Nurse Practitioner to the patients of the Contractee and for ensuring that such care meets or exceeds currently accepted standards of medical competence.

2.7 The Nurse Practitioner will relate to colleagues, staff, patients, and the public in a collegial manner and will abide by standards of conduct appropriate to the workplace.

2.8 The Nurse Practitioner shall assist in the marketing of the Practice and participate in the professional activities that promote the Practice.

2.9 The Nurse Practitioner shall keep and maintain (or cause to be kept and maintained) appropriate records relating to all professional services rendered by Nurse Practitioner under this Agreement and preparing and attending to, in connection with such services, all reports, claims and correspondence necessary and appropriate in the circumstances, all of which records, reports claims, and correspondence shall belong to the Contractee.

2.10 The Nurse Practitioner shall utilize the Contractee's electronic health record to keep and maintain appropriate records relating to all professional services rendered by Nurse Practitioner under this Agreement.

2.11 The Nurse Practitioner shall document all professional services rendered by Nurse Practitioner under this Agreement within twenty-four (24) hours of treating patient.

2.12 The Nurse Practitioner shall comply with policies and procedures established by the Contractee including participation in quality assurance and utilization review activities.

3. COMPENSATION. In consideration of the Nurse Practitioner rendering services under this Agreement, Contractee shall compensate Nurse Practitioner Seventy-Five Dollars ($75.00) per hour up to a maximum of Six Hundred

Dollars ($600.00) per day which will be paid within 10 days of invoice submission. Nurse Practitioner will be responsible for all Federal, State, and Local employment taxes on all income earned. Nurse Practitioner will not be eligible for any benefits relative to this Contract for Social Security, North Carolina Workers Compensation, Unemployment Insurance, North Carolina Teachers' and State Employees' Retirement System, Federal Family & Medical Leave Act, health or disability benefits, vacation pay, sick leave or employee benefits of any kind. Contractee, in accordance with federal or state requirements, will submit a Form 1099 at calendar year-end to the Federal Government for Nurse Practitioner if gross income exceeds $600, which thereupon will be reported for income tax purposes.

4. MALPRACTICE INSURANCE. The Contractee shall, at Contractee's sole cost and expense, purchase and maintain in full force malpractice insurance for Nurse Practitioner. The policy will be a claims-made policy of $1 Million per occurrence/$3 Million annual aggregate coverage.

5. PROFESSIONAL REQUIREMENTS. Nurse Practitioner shall maintain:

   5.1 An unrestricted license to practice in the state of North Carolina;
   5.2 Current unrestricted D.E.A. registration; and
   5.3 Maintenance of FNP-certification

6. BILLING AND FEES. Contractee shall bill and collect for any and all billable services provided by Nurse Practitioner under this Agreement. Contractee shall retain all revenues collected from such billings. Nurse Practitioner acknowledges that he/she acquires no ownership interest in or personal claim to any fees charged or revenue received for any services rendered by Nurse Practitioner hereunder whether such services be professional, advisory or administrative, and whether said fees are collected during his/her employment or after termination thereof. Nurse Practitioner agrees to execute in a timely fashion such reassignment and credentialing forms as may be required to facilitate billing and collection by Contractee.

7. CONTRACTEE RECORDS. The ownership and right of control of all reports, records and supporting documents prepared in correction with the services rendered by Nurse Practitioner shall vest exclusively with Contractee. Nurse Practitioner shall have such rights or access to such reports, records and supporting documentation as provided by Contractee' s policies.

5

8.  NON-COMPETITION, CONFIDENTIALITY, NON-SOLICITATION. Nurse Practitioner acknowledges that Contractee has invested substantial time money and resources in the development and retention of its Confidential Information (which may include trade secrets as defined under N.C. General Statute Section 66-152 et al.), customers and clients, accounts and business partners, and further acknowledges that during the course of Physician Assistant's engagement with Contractee, Nurse Practitioner has had and will have access to the Contractee's Confidential Information and will be introduced to existing and prospective customers and clients, books and records relating to operations such as patient's names, addresses and price lists, patient requirements, cost of requiring services and equipment, operating and maintenance costs and pricing matters, accounts and business partners of Contractee, and other proprietary information.

Nurse Practitioner recognizes that a large portion of Contractee' s services is dependent upon a large amount of Confidential Information and secrets and that the protection of this information against unauthorized disclosure is of critical importance. Nurse Practitioner acknowledges that these confidential matters include information not generally known or available to the public.

Nurse Practitioner acknowledges and agrees that any and all "goodwill" associated with any existing or prospective customer, patient, account or business partner belongs exclusively to Contractee, including, but not limited to, and goodwill created as a result of direct or indirect contacts or relationships between the Nurse Practitioner and any existing or prospective customers, patients, accounts or business partners.

In recognition of the foregoing, Nurse Practitioner covenants and agrees to the following provisions:

8.1 Non-Competition: During the time of Physician Assistant's engagement with Contractee as outlined in this Agreement, and for a period of two (2) years thereafter, the Nurse Practitioner may not, without the prior written consent of the Contractee, directly or indirectly engage in or provide tele-psychiatry services. Tele-psychiatry is the application of telemedicine to the specialty field of psychiatry. Tele-psychiatry is a specifically defined form of video conferencing that can provide psychiatric services to patients living in remote locations or otherwise underserved areas. It connects patients, psychiatrists, physicians, and other healthcare professionals through the use of television cameras and microphones. Telemedicine currently provides an array of services, including but not limited to diagnosis and assessment; medication management; and individual and group therapy. This covenant shall apply to any area within the state of North Carolina.

Nurse Practitioner recognizes that this Agreement contemplates tele-psychiatry services and this Agreement necessarily applies to such services even if Nurse Practitioner is not physically located in the restricted area. As such, this Agreement applies when Nurse Practitioner is offering, marketing or providing tele-psychiatry services in the restricted area, notwithstanding any actual locations in which the Nurse Practitioner may be physically present.

As of the date of the signing of this Agreement, Contractee maintains clients and patients throughout the state of North Carolina. Nurse Practitioner expressly agrees and understands that this Agreement shall be applicable to the entire area of said state.

8.2 Confidentiality: During the time in which Nurse Practitioner is providing services for Contractee, and for a period of two (2) years thereafter, the Nurse Practitioner will not at any time, in any fashion, form or manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation in any manner whatsoever, any information of any kind, nature or description concerning any matters affecting or relating to the business of the Contractee, including, but not limited to: the names of any of the Contractee' s patients, customers or potential customers; the prices at which Contractee sells or has sold its services; the prices at which Contractee sells its services; marketing strategies, programs, plans and pricing strategies; plans for new products or services; information related to compensation, benefits, retirement, recruiting and employment practices, its manner of operation in obtaining patients, customers and clients; and any information, in any form, that is a trade secret within the meaning of N.C. General Statute Section 66-152 et al.; any future plans, processes or other information concerning the Contractee's business of any kind, nature or description without regard to whether any or all of the foregoing matters would be deemed confidential, material or important (collectively the "Confidential Information").

8.3 Non-solicitation: During any and all periods of engagement with Contractee, and for a period of two (2) years thereafter, Nurse Practitioner may not entice, solicit or encourage, either directly or indirectly, any Contractee employee, agent, representative or independent Contractee to leave the employ of the Contractee or to sever its engagement with the Contractee absent prior written consent from Contractee; nor may Nurse Practitioner entice, solicit or encourage any patient, customer or prospective customer of the Contractee to cease doing business with the Contractee,

7

reduce its relationship with the Contractee or refrain from establishing or expanding on a relationship with the Contractee.

12. RELATIONSHIP. Nothing in this Agreement shall constitute or be construed to be or to create a relationship of Nurse Practitioner to Contractee of an employment arrangement.

20. GOVERNING LAW. This Agreement shall be interpreted, construed and governed according to the laws of the State of North Carolina.

ECF No. 82-1 at 1-6.

When Plaintiff signed and submitted the ICA, she was not licensed in North Carolina and had not received her DEA registration, but was actively working toward these requirements, as CapeSide Addiction knew. Plaintiff has produced many emails between her and a representative of CapeSide Psychiatry, Cheryl Macias ("Macias") concerning Plaintiff's efforts at gaining credentialing and beginning work.  ECF Nos. 1-1 at 5-8, 57-1.  Her application to practice as a Nurse Practitioner in North Carolina was approved as of November 29, 2018.  ECF No. 1-1 at 4. There were difficulties in obtaining her DEA registration, as the DEA would not accept the CapeSide Psychiatry physician initially proposed as Plaintiff's supervisor; however, it appears Plaintiff received her DEA registration number on or around November 30, 2018. ECF No. 57-1 at 1.  In December 2018, Plaintiff and representatives of CapeSide Psychiatry were discussing, via email, plans for her to work on Wednesdays and Fridays and "getting [her] started as quickly as possible." ECF No. 1-1 at 5-6.  Although it appears Plaintiff had met the conditions required in the

ICA, she alleges CapeSide Addiction did not thereafter provide patient referrals and did not notify Plaintiff of termination of the agreement.[2]

## DISCUSSION

The Magistrate Judge recommended summary judgment for Defendants finding no contract was formed by the ICA as there was no requirement to provide Plaintiff with a minimum number of referrals; therefore, the contract was illusory.  ECF No. 92 at 9.

Plaintiff objects to the Report, arguing a contract existed between the parties, and it was not referred to as an "Independent Contractor Agreement" or "ICA."  ECF No. 95 at 2.  Essentially she argues the contract was not an ICA because it had a "compete clause" and therefore she should have been considered an employee, and not an independent contractor.[3]  *Id.* She notes the agreement was "signed and sent to the defendant and faxed to the defendant," and Defendants confirmed they received the fax from Plaintiff, so they cannot argue there is not a signed contract. *Id.* at 3.  She contends a valid contract was formed, not merely an "illusionary promise," as there was consideration, acceptance, and affirmation by Plaintiff and Defendants.  *Id.* She questions why Defendants "would continue this process unless there was what they felt an obligation to the

_____

[2] Defendants dispute the ICA was fully executed or that Plaintiff fulfilled regulatory requirements in the ICA to make her eligible to receive patient referrals; however, Defendants specifically note they do not raise these issues as grounds for summary judgment and thus they "are not before the court on this motion."  ECF No. 83 at 2n.1.

[3] While Plaintiff appears to assert the parties' agreement was a contract of employment, there is no support for such a position.  The ICA was an agreement for services of an independent contractor, not an employee.

9

plaintiff that existed in the form of a contract." *Id.* Plaintiff argues there is a genuine issue of material fact so that summary judgment is not appropriate. *Id.* at 4. She notes she was not merely waiting to be credentialed, but also to be assigned a log-on and password to Defendants' electronic medical record to be able to receive referrals. *Id.*

Defendants filed a Reply to Plaintiff's objections, arguing Plaintiff "failed to sufficiently identify the portions of the Report and Recommendation to which she objects." ECF No. 96 at 2. They also argue the ICA did not provide for a minimum number of referrals or revenue; accordingly, there was no breach and no damages resulted from Plaintiff's failure to receive any referrals.

    I.   *Analysis*

        a.  CapeSide Psychiatry

As an initial matter, Defendants argue CapeSide Psychiatry was not a party to the ICA, and should therefore be granted summary judgment. Plaintiff disagrees, noting

> many of the documents signed also included Capeside Psychiatry and that her DEA license had the name CapeSide Psychiatry and Addiction Care. There are records that support that the defendants are subject to the terms of a contractual agreement and that to some degree of reference that CapeSide Psychiatry is a party to this contractual agreement in that they are part of the agency itself.

ECF No. 87 at 5. The court acknowledges many of the emails produced by Plaintiff were from Cheryl Macias, who has an email address at "capesidepsychiatry.com." However, Plaintiff did not produce any agreement reached with CapeSide Psychiatry, and the copies of the ICA submitted by both parties state the agreement was between "CAPESIDE ADDICTION CARE, PLLC ("Contractee") and Kristy Wolff, NP." ECF Nos. 1-1 at 9, 82-1 at 1. The signature block on the

10

final page of the ICA states "CONTRACTEE CapeSide Addiction Care, PLLC." ECF Nos. 1-1 at 16, 82-1 at 8. There is no mention of CapeSide Psychiatry. The court therefore agrees CapeSide Psychiatry was not a party to the ICA, and grants summary judgment for Defendant CapeSide Psychiatry on this claim for breach of contract.

b.  Illusory Contract

As to Defendant CapeSide Addiction Care, the court disagrees with the Report's finding the ICA was as an illusory contract because there was no minimum number of referrals or amount of compensation promised to Plaintiff.[4]  While some contracts without minimum requirements binding one party may be illusory, all contracts in North Carolina contain "an implied covenant of good faith and fair dealing that neither party will do anything that injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 333 S.E.2d 299, 305 (N.C. 1985); *French Broad Place, LLC v. Asheville Savings Bank, S.S.B.*, 816 S.E.2d 886, 898 (N.C. Ct. App. 2018).[5]  Parties may enter a contract that confers "on one party a discretionary power affecting the rights of the other," but  that "discretion must be exercised in a reasonable manner based upon good faith and fair play." *Mezzanotte v. Freeland*, 200 S.E.2d 410, 414 (N.C. Ct. App. 1973); *see also Dysart v. Cummings, 640 S.E.2d 832, 836* (N.C. Ct. App. 2007).  While

_____

[4] Defendants did not argue the ICA was an illusory contract.  Instead, they argued because there was no minimum number of referrals required, Plaintiff cannot establish a breach of the agreement or any damages.

[5] The parties agree North Carolina law applies to this dispute.

11

illusory consideration is not sufficient to bind the parties, the "slightest consideration is sufficient to support the most onerous obligation, [and] the inadequacy… is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced." *Hejl v. Hood, Hargett & Associates, Inc.*, 674 S.E.2d 425, 429 (N.C. Ct. App. 2009).[6]

Under the ICA, CapeSide Addiction had discretion to determine when and how many patient referrals to provide Plaintiff.  However, this discretion was limited by the implied duty of good faith imposed on all parties to a contract.  *See Banyan GW, LLC v. Wayne Preparatory Academy Charter School, Inc., et al.*, 822 S.E.2d 791 (Table), 2019 WL 438327, at *8 (N.C. Ct. App. Feb. 5, 2019) ("Defendants argue that Banyan's discretion under the contract is limitless, but North Carolina law – as noted above – provides that such discretion is limited by the implied duty of good faith imposed by law on all parties to a contract."); *NuVasive, Inc. v. Jones*, Case No. 1:18-CV-282, 2018 WL 4030534, at *4 (M.D.N.C. July 10, 2018) ("[T]hat InoSpine reserved the sole and absolute discretion to determine the defendant's commission does not render the agreement illusory because there is no requirement that [the contract] contain agreed-upon amounts of compensation and because InoSpine was obligated to exercise good faith in determining the commission rate."). Therefore, despite there being no minimum number of referrals required by the ICA, CapeSide Addiction had a duty to exercise good faith in providing referrals, and failure to do so can be considered a breach of contract.

––––––––––––––––––––––––

[6] The Supreme Court has instructed courts "to avoid construction of contracts that would render promises illusory because such promises cannot serve as consideration for a contract."  *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015) (citing 3 Williston § 7:7 (4th ed. 2008)).

In essence, what CapeSide Addiction argues is that its standard form ICA is unenforceable because, despite an agreement to provide referrals to its independent nurse practitioner contractors, it has no obligation to do so and a failure to do so can never be considered a breach of the ICA. Whether CapeSide Addiction exercised good faith, or whether the ICA was ever executed or Plaintiff fulfilled regulatory requirements, are issues Defendants have chosen not to raise in this motion.

The court has reviewed the cases cited in the Report regarding illusory contracts and finds them distinguishable.  In *Milner Airco, Inc. of Charlotte, NC v. Morris*, 433 S.E.2d 811, 814 (N.C. 1993), the court found a non-complete clause illusory when it was added after the employee began work and was not based on any additional consideration or new promise made by the employer. That is not the case in here, where the ICA was the initial agreement between the parties and nothing was added at a later point. *See id.* at 869. The court in *Bowman v. Hill*, 262 S.E.2d 376 (N.C. 1980), found a promise illusory when the parties agreed to build a joint parking lot if the defendants ever developed the land adjacent to the plaintiff's building.  Because the defendants did not develop the land, but instead sold it, the court found the agreement terminated by the conveyance and thus no promise to build the parking lot could be enforced.  In that case, it was clear there was an event that had to occur, namely the development of the land by the defendants, before the construction of the parking lot.  Because the defendants decided not to develop the land, but instead to sell it, no duty arose under the contract and so no breach occurred.  Although Plaintiff was required to obtain her North Carolina Nurse Practitioner license and DEA registration before she could receive referrals, it appears she did so, yet she alleges no referrals were provided.

13

The Report also cited a bankruptcy case, *In re WHET, Inc.*, where that court found the contract *may* have been invalid because the management contract provided that "no minimum number of hours shall be required to be provided by" the manager. *In re WHET, Inc.*, 33 B.R. 443, 447 (Bankr. D. Mass. 1983). However, the court also noted that contract "was merely an attempt by [the manager] to assure himself of a claim for compensation regardless of the outcome of the Chapter 11 and despite his then confinement in federal prison." *Id.* at 447. In this case, it is clear the parties intended an agreement for services to be reached under which each expected the other to perform. See ICA, ECF No. 82-1 at 1 ("WHEREAS, Contractee desires to utilize Nurse Practitioner's services upon the terms and conditions hereinafter set forth, and the Nurse Practitioner desires to accept such work . . .").

Finally, in *Echols v. Pelullo*, the Third Circuit reversed the district court and found a contract *was* enforceable when a promotional agreement for a boxer "clearly contemplated" an outcome where no bouts were entered, as long as the boxer dealt exclusively with the promoter and there were the requisite number of offers made. *Echols*, 377 F.3d 272, 276 (3d Cir. 2004). The court finds this distinguishable because there was an agreement to make at least three offers, even if they ultimately did not result in bouts occurring.

c.  <u>Indefiniteness</u>

Two cases cited in the Report discussed invalidation of indefinite contracts because of undefined terms.[7] The contract alleged in *Laseter v. Pet Dairy Products,* 246 F.2d 747, 750 (4th

---

[7] These cases applied South Carolina law.

14

Cir. 1957) was found to be too indefinite to enforce when no specific job was mentioned and there was no discussion of rates of pay, hours of employment, or duration of employment. Similarly, the Fourth Circuit has found the parties agreed to enter into negotiations to reach an agreement, but subsequently failed to agree on essential terms "pertaining to land allocation, divisions of parcels, and restrictive covenants for the property" and so no contract was formed. *BCD LLC v. BMW Mfg. Co., LLC*, 360 Fed. Appx. 428, 434–35 & n.2 (4th Cir. 2010).

> The Restatement (Second) of Contracts states:
>
> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement (Second) of Contracts § 33 (1981). The comments note regarding price uncertainties, "Where the parties manifest an intention not to be bound unless the amount of money to be paid by one of them is fixed or agreed and it is not fixed or agreed there is no contract."). *Id.* at § 33 Cmt. (e) (citing Uniform Commercial Code § 2-305(4). In addition, promises may be indefinite in other aspects than time and price. "The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable." *Id.* at § 33 Cmt. (f). However, "[t]he law does not favor the destruction of contracts on account of uncertainty, and the courts will, if possible so construe the contract as to carry into effect the reasonable intent of the parties, if it

15

can be ascertained." *Chew v. Leonard*, 44 S.E.2d 869, 872 (N.C. 1947).  Further, the implied duty of good faith applies regarding indefiniteness, as well.

The ICA here had essential terms, including rates of pay and description of services to be performed.  Further, the ICA included requirements for termination, and non-compete and non-solicitation clauses, providing additional consideration for the promise of referrals.  The court therefore finds the ICA was not too indefinite to be enforced.

d.  <u>Conclusion regarding the ICA</u>

Based on the above, the court determines the ICA is not illusory or indefinite, as it contains essential terms, is sufficiently definite, and is supported by consideration, despite the fact it did not include a minimum number of referrals CapeSide Addiction was to provide.  In addition, the court finds it possible for Plaintiff to establish a breach of the ICA if she can show a failure to exercise good faith in making referrals. The terms of the ICA require Plaintiff to obtain and maintain her North Carolina Nurse Practitioner's license, DEA registration, and Family Nurse Practitioner certification; fulfill the duties of a tele-psychiatry Nurse Practitioner, including not only to provide patient services on referrals provided by CapeSide Addiction, but also to assist in practice marketing and professional activities to promote the practice, to comply with CapeSide Addiction's policies and procedures by participating in quality assurance and utilization reviews; and to refrain from providing tele-psychiatry services to other providers in the entire state of North Carolina during the term of the ICA and for two years after its termination.  She was also bound to keep practice information confidential and not solicit CapeSide Addiction employees or patients for a two-year period after the ICA ended. CapeSide Addiction agreed to obtain malpractice

16

insurance for Plaintiff, to bill/collect fees, and to maintain records.  Most importantly, CapeSide Addiction had a duty to perform in good faith – here, to provide referrals if available – or to terminate the agreement per the termination clause.

Plaintiff inquired multiple times via email regarding the status of her role as an independent contractor Nurse Practitioner, and notified CapeSide Addiction she needed to pursue other opportunities if it was not interested in continuing.  Despite this, CapeSide Addiction did not inform her it would not provide referrals once her credentials were obtained.  It appears to the court, therefore, that both Plaintiff and CapeSide Addiction believed the ICA was enforceable, despite not requiring a minimum number of referrals.  Further, as far as damages, the court cannot say as a matter of law Plaintiff has suffered no damages. Plaintiff has alleged she attended training to bill services for Medicaid but was not paid for her time (ECF No. 95 at 6), and that she was "offered other hours for employment, but wanted to honor our contract first for Wednesday's and Friday's" (ECF No. 57-1 at 2).

Accordingly, after reviewing the record of this matter, the applicable law, the Report and Recommendation of the Magistrate Judge, Plaintiff's objections, and Defendants' reply, the court declines to adopt the Report, finding the ICA was not illusory or indefinite as a matter of law. The court further finds Plaintiff's claim of breach does not fail as a matter of law simply because the ICA contains no agreement to provide a minimum number of referrals.  Rather, the ICA obligates CapeSide Addiction to exercise good faith in complying with its promise of referrals.  Plaintiff alleges it failed to do so.  Therefore, CapeSide Addiction's motion for summary judgment is

denied.  However, as CapeSide Psychiatry was not a party to the ICA, its motion for summary

judgment is granted, and it is dismissed with prejudice.

The court will hold a telephone conference with Plaintiff and counsel for CapeSide

Addiction on September 8, 2021, at 1:30pm to discuss a further scheduling order in this matter.

The motion for mediation is held in abeyance pending the telephone conference.

**IT IS SO ORDERED**.

<u>s/Cameron McGowan Currie</u>
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
August 16, 2021

18